**United States District Court**
**Southern District of Texas**
**Victoria Division**

| | |
|---|---|
| STATE OF TEXAS,<br>    *Plaintiff,*<br>v.<br>ROCHELLE WALENSKY, in her official<br>    capacity as Director of the Centers for<br>    Disease Control & Prevention;<br>CENTERS FOR DISEASE CONTROL &<br>    PREVENTION;<br>XAVIER BECERRA, in his official capacity as<br>    Secretary of Health and Human Services;<br>U.S. DEPARTMENT OF HEALTH & HUMAN<br>    SERVICES;<br>ALEJANDRO MAYORKAS, in his official<br>    capacity as Secretary of Homeland<br>    Security;<br>U.S. DEPARTMENT OF HOMELAND SECURITY;<br>CHRISTOPHER MAGNUS, in his official<br>    capacity as Commissioner of U.S.<br>    Customs & Border Protection;<br>U.S. CUSTOMS & BORDER PROTECTION;<br>TAE JOHNSON, in his official capacity as<br>    Acting Director of U.S. Immigration &<br>    Customs Enforcement; and<br>U.S. IMMIGRATION & CUSTOMS<br>    ENFORCEMENT;<br>    *Defendants.* | Case 6:22-cv-13 |

## Complaint

1.    The Biden Administration's disastrous open border policies and its confusing and haphazard COVID-19 response have combined to create a humanitarian and public safety crisis on our southern border. The Defendants now seek to eliminate their Title 42 border-control measures, which are the only rules holding back a devastating flood of illegal immigration. But they

failed to follow the Administrative Procedure Act in attempting this destructive rescission of Title 42. Without justification or concern for Texans, the Defendants unlawfully disregarded the APA's notice-and-comment requirements, refused to consider numerous factors of crucial importance to their rulemaking, and laid bare the incoherence of their decision-making. The State of Texas respectfully requests preliminary and permanent injunctive relief to block Defendants' termination of Title 42.

## Parties

### A. Plaintiff.

2.      Plaintiff State of Texas is a sovereign State of the United States of America. It spends significant amounts of money providing services to illegal aliens. Those services include education services and healthcare, as well as many other social services broadly available in Texas. Federal law requires Texas to include illegal aliens in some of these programs. As the number of illegal aliens in Texas increases, the number of illegal aliens receiving such services likewise increases.

3.      The Emergency Medicaid program provides health coverage for low-income children, families, seniors, and the disabled. Federal law requires Texas to include illegal aliens in its Emergency Medicaid program. The program costs Texas tens of millions of dollars annually.

4.      The Texas Family Violence Program provides emergency shelter and supportive services to victims and their children in Texas. Texas spends more than a million dollars per year on the Texas Family Violence Program for services to illegal aliens.

5.    The Texas's Children's Health Insurance Program offers low-cost health coverage for children from birth through age 18. Texas spends tens of millions of dollars each year on CHIP expenditures for illegal aliens.

6.    Further, Texas faces the costs of uncompensated care provided by state public hospital districts to illegal aliens which results in expenditures of hundreds of millions of dollars per year.

7.    These harms will only grow over time. As DHS and federal courts have found, incentives matter: reducing the likelihood that an alien will be released into the United States reduces the number of aliens who attempt to enter the United States illegally. *Texas v. Biden*, No. 2:21-cv-67, 2021 WL 3603341, at *6, *18–19 (N.D. Tex. Aug. 13, 2021); *cf. Zadvydas v. Davis*, 533 U.S. 678, 713 (2001) (Kennedy, J., dissenting) ("An alien . . . has less incentive to cooperate or to facilitate expeditious removal when he has been released, even on a supervised basis, than does an alien held at an [ICE] detention facility.").

**B. Defendants.**

8.    Defendant Centers for Disease Control and Prevention is a constituent agency of Defendant U.S. Department of Health and Human Services. CDC conducts specified functions under the Public Health Service Act, including exercising authority delegated by HHS.

9.    Defendant Rochelle Walensky is the Director of CDC. Texas sues her in her official capacity.

10.   Defendant Xavier Becerra is the Secretary of HHS. Texas sues him in his official capacity.

11.   Defendant U.S. Department of Homeland Security oversees the Defendants U.S. Customs and Border Protection and U.S. Immigration and

Customs Enforcement, which are constituent agencies of DHS. DHS and its constituent agencies enforce the INA, and DHS has a duty to enforce orders issued by the CDC under the Public Health Safety Act and its regulations.

12.     Defendant Alejandro Mayorkas is the Secretary of DHS. Texas sues him in his official capacity.

13.     Defendant Christopher Magnus is the Commissioner of CBP. Texas sues him in his official capacity.

14.     Defendant Tae Johnson is the Acting Director of ICE. Texas sues him in his official capacity.

## Jurisdiction and Venue

15.     The Court has jurisdiction over this dispute because it arises under the Constitution and laws of the United States. *See* 28 U.S.C. §§ 1331, 1346, 1361; 5 U.S.C. §§ 702–703. It has jurisdiction under 5 U.S.C. §§ 705–706 and 28 U.S.C. §§ 1361 and §§ 2201–2202 to render the declaratory and injunctive relief that Texas requests.

16.     This district is a proper venue because the State of Texas resides in this district and a substantial part of the events or omissions giving rise to Texas's claims occurred here. 28 U.S.C. § 1391(e).

## Facts

### A. The INA's detention and enforcement requirements.

#### 1.  Detention and enforcement generally.

17.     The Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135, and the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.*, charge DHS with enforcing the United States' immigration laws. Under the immigration laws, "several classes of aliens are 'inadmissible' and therefore 'removable.'" *Dept. of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1964 (2020) (citing

8 U.S.C. §§ 1182, 1229a(e)(2)(A)). Among these classes are aliens who lack a valid entry document when they apply for admission. 8 U.S.C. § 1182(a)(7)(A)(i)(l). Applicants for admission include both aliens who arrive in the United States and aliens who are present in the United States without having been lawfully admitted, who are deemed to have applied for admission. 8 U.S.C. § 1225(a)(1).

18.    An inadmissible alien may be removed; the standard process involves an evidentiary hearing before an immigration judge at which the alien may present evidence and argue against removal. *Thuraissigiam*, 140 S.Ct. at 1964. However, this process is slow, and while "removal is being litigated, the alien will either be detained, at considerable expense, or allowed to reside in this country, with the attendant risk that he or she may not later be found." *Id.*

19.    To address these problems, Congress created more expedited procedures that apply to aliens who are "present in the United States who [have] not been admitted" and to aliens "who arrive[] in the United States (whether or not at a designated port of arrival. . . .)." 8 U.S.C. § 1225(a)(1). These aliens are subject to expedited removal if they (1) are inadmissible because they lack a valid entry document; (2) have not "been continuously physically present in the United States for the two years preceding their inadmissibility determination; and (3) are among those whom the Secretary of Homeland Security has designated for expedited removal. *See id.* § 1225(b)(1)(A). Once an immigration officer determines that such an alien is inadmissible, the alien must be ordered "removed from the United States without further hearing or review." *Id.* § 1225(b)(1)(A)(i).

20.    Whether subject to the standard removal process or the expedited process, aliens who intend to claim asylum or who claim a credible fear of persecution are not deportable while that claim is being investigated. *See* 8

U.S.C. §§ 1158, 1225(b)(1). But those aliens must be detained until their entitlement to asylum is determined. *Id.* § 1225(b)(1)(B)(ii), (2)(A); *see Jennings v. Rodriguez*, 138 S. Ct. 830, 844–45 (2018) (citing 8 U.S.C. § 1225(b)(1), (2)). DHS may "for urgent humanitarian reasons or significant public benefit" temporarily parole these aliens, but it may do so "only on a case-by-case basis." 8 U.S.C. § 1182(d)(5)(A).

**2. Detention and enforcement to protect public health.**

21.    Another class of inadmissible aliens is those who have a "communicable disease of public health significance." 8 U.S.C. § 1182(a)(1)(A)(i). The INA defines a "communicable disease of public health significance" by referring to "regulations prescribed by the Secretary of Health and Human Services." *Id.*

22.    There are two circumstances under which aliens must be detained to determine whether they are inadmissible for public-health reasons. First, they must be detained if DHS has reason to believe they are "afflicted with" such a disease. 8 U.S.C. § 1222(a). Second, they must be detained if DHS "has received information showing that any aliens are coming from a country or have embarked at a place" where such a disease is "prevalent or epidemic." *Id.* This detention must enable "immigration officers and medical officers" to conduct "observation and an examination sufficient to determine whether" the aliens are inadmissible. *Id.*

**B. The COVID-19 pandemic and the federal response.**

23.    In the words of the CDC itself, COVID-19 "is a quarantinable communicable disease caused by the SARS-CoV-2 virus." *Order Suspending the Right to Introduce Certain Persons*, 86 Fed. Reg. 42,828, 42,830 (Aug. 5, 2021). Since it emerged in late 2019, "SARS–CoV–2, the virus that causes

COVID–19, has spread throughout the world, resulting in a pandemic." *Id.* Since COVID-19 was first declared a public-health emergency in January 2020, the federal government has implemented a number of COVID–19 mitigation and response measures.

**1. The original Title 42 orders.**

24.     The Public Service Health Act, Pub. L. 78-410, 58 Stat. 682 (1944), permits CDC's Director to "prohibit, in whole or in part, the introduction of persons and property from such countries or places as he shall designate . . . for such period of time as he may deem necessary." 42 U.S.C. § 265. This power may be employed whenever the Director determines there is "a communicable disease in a foreign country," that "there is a serious danger" that the disease will be introduced to the United States, and that the danger "is so increased by the introduction of persons or property from such country that a suspension of the right to introduce such persons and property is required in the interest of the public health." *Id.* The Director may then issue the prohibition "in accordance with regulations approved by the President." *Id.* Though the Act had been law since 1944, no such regulations were promulgated until 2020.

25.     The first Title 42 rule was issued in March 2020 as an interim final rule. *See* 85 Fed. Reg. 16,559 (Mar. 24, 2020). At the same time, the CDC expressly invited "comment on all aspects of this interim final rule, including its likely costs and benefits and the impacts that it is likely to have on the public health, as compared to the current requirements under 42 CFR part 71." *Id.* at 16,559.

26.     CDC received 218 comments during the 30-day comment window. The final rule "establishe[d] final regulations under which the Director [of the CDC] may suspend the right to introduce and prohibit, in whole or in part, the

introduction of persons into the United States for such period of time as the Director may deem necessary to avert the serious danger of the introduction of a quarantinable communicable disease into the United States." 85 Fed. Reg. 56,424, 56,448 (Sep. 11, 2020) (codified at 42 C.F.R. § 71.40). The day the rule became effective, October 13, 2020, the CDC issued its October Order—its Order Suspending the Right to Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists. 85 Fed. Reg. 65,806–12 (Oct. 13, 2020).

27.    Though issued under the Final Rule, the October Order was the latest in a series of orders issued under the interim final rule.[1] As had the earlier orders, the October Order suspended introducing covered aliens into the United States, a suspension lasting until CDC determined that "the danger of further introduction of COVID-19 into the United States has ceased to be a serious danger to the public health." *Id.* at 65,812. The suspension was based on findings that:

- COVID-19 is a communicable disease that poses a danger to the public health;

- COVID-19 is present in numerous foreign countries, including Canada and Mexico;

- Because COVID-19 is so globally widespread, there is a serious danger that it will be carried into the land ports of entry and Border Patrol stations at or near the United States' borders with Canada and Mexico, and from there into the interior of the country;

---

[1]    The first two of these covered only 30 days each. The third such order required that its propriety be reviewed every 30 days. 85 Fed. Reg. at 17,060 (Mar. 26, 2020); 22,424 (Apr. 22, 2020); 31,503, 31,507–08 (May 26, 2020).

- If their entry were not suspended, covered aliens would go through immigration processing at the land ports of entry and Border Patrol stations, which would require many of them (typically aliens who lack valid travel documents and are therefore inadmissible) to be held in the congregate areas of the facilities, in close proximity to one another, for hours or days;

- Holding them in such settings would increase the already serious danger to the public health of the United States; and

- This increased danger rose to the level that it required a temporary suspension of the introduction of covered aliens into the United States.

*Id.* at 65,810.

28.    Customs and Coast Guard officers have the duty to "aid in the enforcement of quarantine rules and regulations," 42 U.S.C. § 268, and the Order noted that CDC had requested "that DHS aid in the enforcement [of] this Order because CDC does not have the capability, resources, or personnel needed to do so." *Id.* at 65,812. CDC needed this assistance because its own public health tools were not "viable mechanisms given CDC resource and personnel constraints, the large numbers of covered aliens involved, and the likelihood that covered aliens do not have homes in the United States." *Id.*

29.    The October Order applied to all covered aliens, defined as aliens "seeking to enter the United States . . . who lack proper travel documents," "whose entry is otherwise contrary to law," or "who are apprehended at or near the border seeking to unlawfully enter the United States." *Id.* at 65,807.

30.    The October Order noted that expulsions under CDC's prior orders had "reduced the risk of COVID-19 transmission in [ports of entry] and Border Patrol Stations, and thereby reduced risks to DHS personnel and the U.S. health care system." *Id.* at 65,812. It further noted that "[t]he public health

risks to the DHS workforce—and the erosion of DHS operational capacity—would have been greater" without the initial suspension order. Further, the suspension orders "significantly reduced the population of covered aliens in congregate settings in [ports of entry] and Border Patrol stations, thereby reducing the risk of COVID-19 transmission for DHS personnel and others within these facilities." *Id.*

31.     DHS began using its Title 42 authority to expel aliens in March 2020, and the population of aliens processed under Title 8 (the ordinarily applicable immigration rules) plummeted. Out of more than 253,000 total southwest border encounters under Title 8 in Fiscal Year 2020, fewer than 25,000 occurred in the last six months of that year.[2] During that same six-month period, nearly 200,000 aliens were rapidly expelled under Title 42.

**2. Subsequent Title 42 orders.**

32.     On August 3, 2021, CDC issued an order largely re-affirming the October Order. *Pub. Health Reassessment & Order Suspending the Right to Introduce Certain Persons*, 86 Fed. Reg. 48,828 (Aug. 5, 2021). The only change of any significance in the August Order was its confirmation of two previous amending orders that had excluded unaccompanied minors from Title 42's purview. *See* 86 Fed. Reg. at 42,837–38. The August Order summarized the contemporary state of the pandemic. It noted that "[c]ongregate settings, particularly detention facilities with limited ability to provide adequate physical distancing and cohorting, have a heightened risk of COVID-19 outbreaks." *Id.* at 42,833. CBP facilities themselves have "[s]pace constraints

---

[2]     The statistics in this complaint are taken from *Sw. Border Land Encounters*, U.S. CUSTOMS AND BORDER PROT., https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last visited Apr. 22, 2022).

[that] preclude implementation of cohorting and consequence management such as quarantine and isolation." *Id.* at 42,837. More, the "[c]ountries of origin for the majority of incoming covered [aliens] ha[d] markedly lower vaccination rates" than did the United States—of the top five originating countries, El Salvador, at 22%, had the highest rate of vaccinated persons; Guatemala and Honduras, the two lowest, had 1.6% and 1.8%, respectively. *Id.* at 42,834 & n.57.

33.     The August Order conceded that "the flow of migration directly impacts not only border communities and regions, but also destination communities and healthcare resources of both." *Id.* at 42,835. Indeed, it came only days after the Defendants released more than 1,500 COVID-positive illegal aliens into the city of McAllen, Texas.

34.     Since August 2021, Defendants have used their Title 42 authority to expel only half of the illegal border crossers DHS has encountered. The number of aliens encountered at the southwest border between August 2021 through March 2022 totaled nearly 1.46 million, with just over half of those expelled under Title 42. Only 66,289 illegal aliens encountered at the border were removed or returned under Title 8; more than half a million—525,252—were released or paroled into the United States.[3]

35.     On March 4, 2022, in response to a request from Texas, the Northern District of Texas issued a preliminary injunction prohibiting the Defendants from excluding unaccompanied minors from Title 42 "based solely on their

---

[3]     These data are derived from monthly status reports that the government filed in *Texas v. Biden*, No. 2:21-cv-00067, ECF Nos. 106, 112, 115, 119, 124, 129, 133 & 136 (N.D. Tex.). They correspond roughly with the data CBP places online (*see* https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics) but are more comprehensive because they also include data from ICE.

status as unaccompanied alien children." *See Texas v. Biden*, No. 4:21-cv-00579, slip op. at 36 (N.D. Tex. Mar. 4, 2022). In response, CDC issued yet another order the next week, stating that applying Title 42 to unaccompanied minors was "not necessary to protect U.S. citizens" and once again terminating Title 42's application to those minors. 87 Fed. Reg. 15,243, 15,245 (Mar. 17, 2022) (signed Mar. 11, 2022). However, as had the August Order, it continued Title 42's application to individuals in family units and single adults. *Id.*

## C. CDC Terminates Title 42.

### 1. The Termination Order itself.

36. On April 1, 2022, Defendant Walensky issued an order terminating Title 42. Exh. A, *Pub. Health Determ. & Order Regarding the Right to Introduce Certain Persons*, 87 Fed. Reg. 19,941 (Apr. 6, 2022) (signed Apr. 1, 2022). According to Walensky, as of April 1, there was "no longer a serious danger that the entry of covered noncitizens . . . into the United States will result in the introduction, transmission, and spread of COVID-19[.]" *Id.* at 19,944. In reaching this conclusion, she purported to consider "migration patterns, sanitation concerns, and any improvement or deterioration of conditions at the U.S. borders." *Id.* at 19,943. While conceding that "the introduction, transmission, and spread of COVID-19 into the United States is likely to continue to some degree," she nonetheless considered the threat that illegal aliens would spread COVID-19 to no longer be "the serious danger to public health that it once [was], given the range of mitigation measures now available." *Id.*

37. Among the factors Walensky identified as having changed, *id.* at 19,949–51, were:

- "[W]idely available [testing] in the United States," which "may decrease the necessity for testing residents in congregate settings[.]" Yet Walensky does not discuss whether the Defendants are capable of testing illegal aliens they encounter for processing. That number totaled more than 221,000 in March 2022—roughly 70,000 more than CBP had estimated would occur, and roughly 40,000 more than CBP predicts would occur in a "medium encounter" scenario once the Title 42 program ends. CBP itself predicts roughly 360,000 to 540,000 encounters per month in a high or very-high scenario. *See* DHS Sw. Border Coordination Ctr., *Sw. Border Strategic Concept of Operations*, at 2–3 (Mar. 28, 2022).

- An increase in the number of persons around the world who are "fully vaccinated with a primary vaccine series[.]" Yet Walensky discusses global numbers rather than numbers in Mexico and the Northern Triangle of Guatemala, El Salvador, and Honduras, from which most illegal aliens come—much less numbers actually observed in illegal aliens themselves. And most countries in the Western Hemisphere have approved one or both of the Sinopharm and Sinovac vaccines; Walensky does not note what proportion of the numbers, either generally or from the most relevant countries, are made up of those largely ineffective vaccines.

- Wider availability of treatments for COVID-19. Yet Walensky does not note that the cost of those treatments for illegal aliens in Texas will be borne by charity-care providers and the State itself through its federally mandated Emergency Medicaid program.

- "DHS mitigation measures," such as DHS facilities' "incorporat[ing] some of the recommended COVID-19 mitigation measures for

congregate settings" and DHS's goal "to provide vaccinations to up to 6,000 migrants a day . . . across the Southwest Border by May 23, 2022." Yet Walensky does not note which mitigation measures DHS has adopted or the effectiveness of those measures. Nor does she note whether DHS is capable of meeting its announced goal, much less whether it could vaccinate the 540,000 illegal aliens CBP predicts may be encountered each month.

38.    Even when she must acknowledge the obvious, Walensky does not grapple with it. Walensky recognizes that the Termination Order itself "will lead to an increase in the number of noncitizens being processed in DHS facilities[,] which could result in overcrowding in congregate settings." *Id.* at 19,956. And she acknowledges that DHS's projection of even further increases in encounters, leading to even further crowding in DHS facilities. *Id.* She dodges these concerns by noting that "DHS reports that it is taking steps to plan for such increases" and that delaying the termination until May 23 will "provide DHS with time to scale its vaccination program, as well as ready its operational capacity [and] implement appropriate COVID-19 protocols." *Id.* at 19,955–56. But the Termination Order does not discuss what DHS's plans are, how it will achieve them, and whether its goals are even achievable.

39.    There is good reason to believe that DHS's stated goals are illusory. DHS itself has represented that "increasing detention capacity is costly and time-consuming" and would likely require "several months inspecting potential facilities, hiring additional staff, procuring additional supplies, and negotiating contracts with relevant third parties." *See* Defs.' Post-Trial Mem. of Law, *Texas v. United States*, No. 6:21-cv-00016, ECF 223 at 34 (Mar. 18, 2022). And "[f]urther, absent an additional appropriation from Congress, DHS would have to finance this expansion in detention capacity by transferring

funds from other DHS components, like the Coast Guard or Secret Service, or reprogramming funds within ICE, thus harming other DHS missions that are crucial to national security." *Id.* The Termination Order does not state why a mass remodeling-testing-and-vaccination regime would be any more achievable—particularly on the short timeline between the Termination Order and its effective date.

40.     The Termination Order claims that it is "not a rule subject to notice and comment under the Administrative Procedure Act." 87 Fed. Reg. at 19,956. It does so on two putative bases. First, it asserts good cause to avoid furnishing notice and considering comments because "it would be impracticable and contrary to the public interest . . . to delay the effective date of this termination beyond May 23." *Id.* Second, it asserts that the APA's foreign affairs exception by claiming without offering any detail or explanation that "this Order concerns ongoing discussions with Canada, Mexico, and other countries regarding immigration and how best to control COVID-19 transmission over shared borders." *Id.*

## 2. The Termination Order compared to other public-health orders.

41.     The Termination Order itself acknowledges that one of Walensky's earlier orders, the Air Traveler Testing Order, requires that "[a]ll air passengers two years or older with a flight departing to the United States from a foreign country" must show either "a negative COVID-19 viral test result" no more than a day old or "documentation of having recovered from COVID-19 in the past 90 days." 87 Fed. Reg. at 19,947 fn. 82 (citing *Reqts. for Negative COVID-19 Test or Documentation of Recovery from COVID-19 for All Airline or Other Aircraft Passengers Arriving in the U.S.*, 86 Fed. Reg. 69,256 (Dec. 7, 2021)). The Air Traveler Testing Order states that it "is necessary to reduce

the risk of transmission of the [COVID-19] virus" and that it will remain in effect until it "is no longer necessary to prevent the further introduction, transmission, and spread of COVID-19 into the United States." 86 Fed. Reg. at 69,260. Visitors who do not comply with those requirements are not allowed to enter the United States, and an aircraft that has not confirmed that its passengers comply may not enter the United States or allow passengers to disembark there. *Id.* at 69,261.

42. A directive by Defendant Mayorkas, the Land Traveler Vaccination Order, is similar. There, Mayorkas ordered that, "due to the risk of continued transmission and spread of . . . COVID-19 between the United States and Mexico," only aliens "who are 'fully vaccinated against COVID-19' and can provide 'proof of being fully vaccinated against COVID-19' upon request" would be allowed to enter the United States from land ports-of-entry along the U.S.–Mexico border. *Notif. of Temp. Travel Restrictions Applicable to Land Ports of Entry and Ferries Svc. Between the U.S. and Mex.*, 87 Fed. Reg. 3425, 3428 (Jan. 24, 2022). As support for this decision, he cited CDC's recommendations, *id.* at 3426, and noted that CBP had assessed "that a testing option is not operationally feasible given the significant number of land border crossers that go back on forth on a daily, or near-daily basis, for work or school" and that CBP faced "additional operational challenges associated with verifying test results, given the wide variation in documentation," *id.* at 3426 fn. 10. The Termination Order does not mention this order.

43. The Land Traveler Vaccination Order parallels the Air Traveler Vaccination Order. There, Walensky mandated that air travelers visiting the United States furnish on demand proof of vaccination against COVID-19 or an approved excuse for not having one. *Am. Order Implementing Pres. Procl. On Advancing the Safe Resumption of Global Travel During the COVID-19*

*Pandemic*, 86 Fed. Reg. 61,224 (Nov. 5, 2021). Those who are unable to do so must quarantine or isolate themselves for two weeks after arriving in the United States. *Id.* at 61,228.

44.    Another Walensky order, the Masking Order, requires all persons in "transportation hubs" and "traveling on conveyances into and within the United States" to wear masks to "mitigate the further introduction, transmission, and spread of COVID-19 into the United States and from one state or territory into any other state or territory." *See Reqt. for Persons to Wear Masks While on Conveyances & at Transp. Hubs*, 86 Fed. Reg. 8025, 8026 (Feb. 1, 2021).[4]

45.    The Termination Order attempts to distinguish the Masking Order on several grounds, 87 Fed. Reg. at 19,946 fn. 57:

- First, "conveyances and transportation hubs . . . are locations where large numbers of people may gather and physical distancing can be difficult." But the same is true of facilities where illegal immigrants are detained.

- "[M]any people need to take public transportation for their livelihoods." But the same is true of aliens who attempt to enter the United States either to find work or to claim asylum.

- "Passengers (including young children) may be unvaccinated and some on board, including personnel operating the conveyances or working at the transportation hub, may have underlying health conditions that

---

[4]    The Masking Order was recently enjoined as beyond CDC's statutory authority, inadequately explained, and issued without good cause to dispose of notice-and-comment requirements. *See Health Freedom Defense Fund, Inc. v. Biden*, No. 8:21-cv-1693 (M.D. Fla. Apr. 18, 2022). Though the federal government has appealed that decision, CDC has announced it will no longer enforce the order.

cause them to be at increased risk of severe illness." The same is true of illegal aliens themselves; those traveling with illegal aliens; and those working at facilities where illegal aliens are detained, transported, or processed.

- Unvaccinated persons "may not have the option to disembark or relocate to another area of the conveyance." The same is true of illegal aliens themselves, particularly those who are smuggled by human traffickers; those who are traveling with illegal aliens; and those working at facilities where illegal aliens are detained, transported, or processed.

- "Transportation hubs are also places where people depart to different geographic locations, both across the United States and around the world. Therefore, an exposure in a transportation hub can have consequences to many destination communities if people become infected after they travel." The same is true of facilities where illegal aliens are detained, transported, or processed—particularly given the federal government's practice of transporting illegal aliens throughout the country for further processing after they are paroled.

**D. Irreparable Harms to Texas.**

46.     Texas has suffered and continues to suffer irreparable harm because of the Defendants' actions. The October Order acknowledged as much: "[S]everal cities and states, including several located at or near U.S. borders, continue to experience widespread, sustained community transmission that has strained their healthcare and public health systems. Furthermore, continuing to slow the rate of COVID-19 transmission is critical as states and localities ease public health restrictions on businesses and public activities in

18

an effort to mitigate the economic and other costs of the COVID-19 pandemic." 85 Fed. Reg. at 65,812.

47.    In particular, Texas's required expenditures under the Emergency Medicaid program will continue to increase as the Defendants release more aliens from their custody, particularly those who have not been screened for COVID-19. The August Order recognizes that this is a concrete harm and not a potential or hypothetical harm that might occur at some point in the future: The "flow of migration directly impacts not only border communities and regions, but also destination communities and healthcare resources of both." 86 Fed. Reg. at 42,835.

48.    Indeed, these harms may be occurring right now. News reports citing "multiple Border Patrol sources" indicate that the Defendants are already terminating Title 42 as a practical matter by refusing to "remove many migrants from the Northern Triangle countries of Guatemala, Honduras, and El Salvador."[5] And counsel in related litigation has represented that witnesses will testify that Border Patrol agents are being diverted from field duties to provide security while migrants formerly expelled under Title 42 are processed under Title 8. *See* Mem. in Supp. of Mot. for TRO at 1–2, *Arizona v. Ctrs. for Disease Control*, No. 6:22-cv-885 (W.D. La. Apr. 21, 2022),

## Claims for Relief

### A.  Lack of notice-and-comment rulemaking.

49.    The Defendants did not conduct the statutorily required notice and comment process for the Termination Order.

---

[5]    *See* Bill Melugin, Fox News, *Border Patrol not using Title 42 to expel some Northern Triangle migrants ahead of its May 23 end: sources* (Apr. 20, 2022), available at https://fxn.ws/3K4YMxs.

50.     Under the APA, reviewing courts must "hold unlawful and set aside agency action . . . found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

51.     Agencies issuing rules must follow notice-and-comment rulemaking, 5 U.S.C. § 553(b)–(c), and have rules take effect 30 or more days after promulgation, 5 U.S.C. § 553(d), unless an applicable exception applies.

52.     The Termination Order is a substantive rule for APA purposes because it represents the culmination of the agency's consideration and affects the rights and obligations of those to whom it applies. Indeed, the title of the Termination Order itself refers to the "right" affected by the rule, specifically "the right to introduce certain persons from countries where a quarantinable communicable disease exists."

53.     The good-cause exception to the APA's notice-and-comment requirement does not apply. Indeed, while the initial Title 42 regulation was announced as an interim final rule, CDC opened a 30-day notice-and-comment period to enable the public to point out flaws in, potential improvements to, and even reasons for rescinding the rule before it became final, doing so at a time when the COVID-19 pandemic had only recently been declared an emergency and the harm it would inflict was still only conjectural. The basis for the Termination Order is that the emergency has subsided sufficiently to bring the Title 42 program to an end altogether; the lack of an emergency cannot be as pressing as the presence of one. More, given DHS's representation in litigation that it would take several months to plan for a tremendous increase in detention capacity, its representation to CDC that it needs only seven weeks to prepare for a tremendous increase in detention capacity can be true only if it had been planning for such an increase for, at the least, several

weeks before the Termination Order. If that is the case, there was ample time to notify the public of, and allow it to comment on, the proposed termination.

54.    Nor does the foreign-affairs exception to the APA's notice-and-comment requirement apply. Implementing the Termination Order through notice-and-comment rulemaking would not have "provoke[d] definitely undesirable international consequences." *Zhang v. Slattery*, 55 F.3d 732, 744 (2d Cir. 1995) (citation omitted), *superseded by statute on other grounds by* 8 U.S.C. § 1101(a)(42). That the United States is engaged in "ongoing discussions with Canada and Mexico on how best to control COVID-19 transmission over our shared borders," 87 Fed. Reg. at 19,956, does not entitle the Defendants to except the Termination Order from the APA's procedures. There is no evidence that complying with the APA's rulemaking procedures would cause a diplomatic incident, particularly given that the Termination Order is lifting, rather than imposing, restrictions on travel from Canada and Mexico.

**B. Arbitrary and capricious agency action.**

55.    The Termination Order is arbitrary and capricious because it was not the product of reasoned decision-making. For one, the Defendants did not consider all relevant factors before deciding to terminate the Title 42 program. For another, the Termination Order does not explain inconsistencies in the Defendants' rules covering the same issue.

56.    One stark inconsistency is DHS's wholesale termination of the Title 42 program while maintaining a masking regime for intra-U.S. transportation and a proof-of-immunity regime for lawful international travelers. COVID-19 cannot pose such a substantial threat to public health that it requires those legally entering the United States to furnish proof of vaccination or immunity upon demand—on penalty of being immediately sent back whence they came—

while simultaneously allowing illegal entrants access to the country without even evidence of a negative test. More, as the Termination Order admits, "DHS is currently scaling up a program that provides vaccines to encountered noncitizens taken into CBP custody along the Southwest Border"—but it simultaneously refuses admission to unvaccinated persons who seek legal entry to the United States rather than furnishing them vaccines upon their arrival at the border. So too with the inconsistency in the Defendants' refusal to allow those legally present but unmasked access to transportation and federal property due to crowding and lack of alternatives and their simultaneous policy of congregating those illegally present into federal facilities without alternative.

57.     Nor did the Defendants consider all the relevant factors before issuing the Termination Order. For example, Texas will face increased healthcare costs due to the increased presence of illegal aliens with COVID-19 who otherwise would have been excluded from the country under Title 42, and it has relied on the Title 42 program in planning for the COVID-19 related costs it should expect to incur. The Termination Order hand-waves these interests as unreasonable, essentially because CDC was always going to determine someday that COVID-19 was not sufficiently threatening to continue Title 42. 87 Fed. Reg. at 19,954. That is a strawman. While a reasonable State would not expect a perpetual emergency, it would expect that the costs imposed on its healthcare system would be considered in determining whether an emergency continues to exist—costs that the Termination Order addresses nowhere.

58.     Similarly, the Defendants themselves imported irrelevant factors into their decision, and to the extent that those factors were relevant, they were required to consider the countervailing evidence—which they did not. As

the Termination Order acknowledges, the Title 42 regulation and orders "are not, and do not purport to be, policy decisions about controlling immigration; rather," they "depend[] on the existence of a public health need." *Id.* at 19,954. The Defendants nevertheless justify their evasion of notice-and-comment procedures in part based on the "restrictions on application for asylum and other immigration processes under Title 8" that Title 42 causes, on Title 42's "significant disruption of ordinary immigration processing," and on the time "DHS requires . . . [to] begin regular immigration processing pursuant to Title 8." *Id.* at 19,956. But if Texas's "relying on an order under [Title 42] as a means of controlling immigration . . . would not be reasonable or legitimate," then neither is DHS's similar reliance. And if the Defendants' concerns about the immigration process are connected enough to Title 42 to warrant dodging notice and comment, then Texas's countervailing concerns about the immigration process—including the costs that illegal immigration imposes on it both as a sovereign and as *parens patriae*—are sufficiently connected to Title 42 to demand consideration.

## Prayer for Relief

For these reasons, Texas prays that the Court:

- Stay, postpone, or preliminarily enjoin the Defendants' implementation of the Termination Order;

- Following a trial on the merits, decree that the Termination Order was issued in violation of the APA and set it aside and remand it for further consideration or, in the alternative, permanently enjoin the Defendants from implementing it;

- Award Texas its attorneys' fees and costs of court; and

- Award Texas all other relief to which it may be entitled.

Dated April 22, 2022.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711-2548
(512) 936-1700

Respectfully submitted,

*/s/ Aaron F. Reitz*

AARON F. REITZ
*Lead Counsel*
Deputy Attorney General for Legal Strategy
Texas Bar No. 24105704
aaron.reitz@oag.texas.gov

LEIF A. OLSON
Special Counsel
Texas Bar No. 24032801
leif.olson@oag.texas.gov

CHRISTOPHER D. HILTON
Chief, General Litigation Division
Texas Bar No. 24087727
christopher.hilton@oag.texas.gov

GENE P. HAMILTON*
America First Legal Foundation
300 Independence Avenue SE
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

CHRISTOPHER J. HAJEC*
MATT A. CRAPO*
Immigration Reform Law Institute
25 Massachusetts Ave., NW, Suite 335
Washington, DC 20001
(540) 205-7986
litigation@irli.org

*Counsel for the State of Texas*

---

* Application for admission *pro hac vice* forthcoming