# United States District Court
## Southern District of Texas
## Victoria Division

STATE OF TEXAS,
    *Plaintiff,*

v.

ROCHELLE WALENSKY, *et al.*;
    *Defendants.*

Case 6:22-cv-13

## **Emergency Motion to Postpone or Preliminarily Enjoin Termination Order**

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

AARON F. REITZ
*Lead Counsel*
Deputy Attorney General for Legal Strategy
Texas Bar No. 24105704
aaron.reitz@oag.texas.gov

LEIF A. OLSON
Special Counsel
Texas Bar No. 24032801
leif.olson@oag.texas.gov

CHRISTOPHER D. HILTON
Chief, General Litigation Division
Texas Bar No. 24087727
christopher.hilton@oag.texas.gov

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711-2548
(512) 936-1700

GENE P. HAMILTON
America First Legal Foundation
300 Independence Avenue SE
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

CHRISTOPHER J. HAJEC
MATT A. CRAPO
Immigration Reform Law Institute
25 Massachusetts Ave., NW, Suite 335
Washington, DC 20001
(540) 205-7986
litigation@irli.org

*Counsel for the State of Texas*

# Contents

Table of Authorities..........................................................................................2

**Introduction**..............................................................................................4

**Background**.................................................................................................4

**Standard and Summary of the Argument** ...............................6

**Argument** ...................................................................................................7

   A. Texas is likely to prevail on the merits.......................................7

      1. The Defendants' decision to terminate Title 42 was unreasoned. ....7

        a. The Termination Order is inconsistent with and not rationally connected to the Defendants' other COVID-19 orders. ...............7

        b. The Termination Order did not consider all relevant factors. ...13

        c. The Termination Order itself demonstrates that the factors it did consider received only partial consideration. ........................14

      2. The Termination Order was promulgated without the necessary notice-and-comment period................................................................17

   B. Texas is suffering irreparable harm. ....................................................18

   C. The public interest and the equities favor an injunction.....................19

**Prayer for Relief** ....................................................................................20

**Certificate of Word Count**..................................................................22

**Certificate of Conference** ...................................................................22

# Table of Authorities

**Cases**

*Capital Area Immigrants' Rights Coalition v. Trump*, 471 F. Supp. 3d 25 (D.D.C. 2020) ................................................................................ 18

*Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971) ................... 14

*Daniels Health Scis., LLC v. Vascular Health Scis., LLC*, 710 F.3d 579 (5th Cir. 2013) ............................................................................... 6, 7

*Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050 (D.C. Cir. 1986) ........... 14

*Health Freedom Defense Fund, Inc. v. Biden*, No. 8:21-cv-1693, 2022 WL 1134138 (M.D. Fla. Apr. 18, 2022) ................................................. 11

*Janvey v. Alguire*, 647 F.3d 585 (5th Cir. 2011) ................................................ 7

*League of Women Voters v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ..................... 20

*Michigan v. EPA*, 579 U.S. 743 (2015) ..................................................... 13, 14

*Motor Vehicle Mfrs. Assn*, 463 U.S.at 43 ........................................................ 14

*Motor Vehicle Mfrs. Assn. of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ............................................................................. 13

*Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68 (D.C. Cir. 2020) .................... 17

*Nken v. Holder*, 556 U.S. 418 (2009) ............................................................... 19

*Sierra Club v. EPA*, 939 F.3d 649 (5th Cir. 2019) ............................................. 7

*Tex. Food Indus. Assn. v. U.S. Dept. of Ag.*, 842 F. Supp. 254 (W.D. Tex. 1993) ....................................................................................................... 17

*Texas v. Biden*, 20 F.4th 928 (2021) ................................................................. 19

*Texas v. United States*, 328 F. Supp. 3d 662 (S.D. Tex. 2018) ........................ 19

*Texas v. United States*, 95 F. Supp. 3d 965 (N.D. Tex. 2015) ........................... 6

*Texas v. United States*, No. 6:21-cv-00016 (Mar. 18, 2022) ............................ 17

*U.S. Steel Corp. v. EPA*, 595 F.2d 207 (5th Cir. 1979) .................................... 17

**Statutes**

5 U.S.C. § 553 (a)(1) .......................................................................................... 18

5 U.S.C. § 553(b)(B) .................................................................... 17

5 U.S.C. § 553(b)–(c) .................................................................. 17

5 U.S.C. § 705 ............................................................................. 6

5 U.S.C. § 706(2)(A) .................................................................... 7

5 U.S.C. § 706(2)(A), (D) ............................................................. 6

**Other Authorities**

*COVID-19 Vaccine Devt. & Approvals Tracker*, available at
covid19.trackvaccines.org (last visited Apr. 22, 2022) .................. 15

DHS Sw. Border Coordination Ctr., *Sw. Border Strategic Concept of
Operations*, at 2–3 (Mar. 28, 2022) ............................................ 15

## Introduction

Agencies must justify their actions with reason. They must notify interested parties of their proposed actions and address comments from those interested parties before promulgating rules. The Defendants' order terminating the Title 42 program failed both these tests. Texas therefore moves that the Court postpone or preliminarily enjoin the Defendants' implementation of the Termination Order until a final judgment on the merits that requires them to rectify these errors.

Because the Termination Order is scheduled to go into effect on May 23, Texas respectfully requests that the Court expedite consideration of this Motion so it can be decided before the axe falls.

## Background

The Department of Homeland Security is charged with enforcing the United States' immigration laws. This case concerns DHS's obligations to detain aliens in accordance with those laws. This case also concerns DHS's obligations to aid in the enforcement of orders issued by the Director of the Centers for Disease Control and Prevention (CDC) to prevent the introduction of aliens into the United States who pose a serious threat of introducing a communicable, quarantinable disease. At issue are:

- Portions of the ***Immigration and Nationality Act*** requiring that DHS detain aliens pending either their removal or a determination as to whether they pose a threat to public health;

- Portions of the ***Public Health Service Act*** requiring that DHS assist CDC in enforcing orders concerning public-health issues within DHS's purview, such as immigration;

- A ***Final Rule*** adopted by the CDC allowing it to exclude from the country aliens who pose a serious threat of introducing a communicable, quarantinable disease;
- An ***October 2020 Order***, Exhibit B, putting that rule into effect and allowing for rapid removal of covered aliens;
- An ***August 2021 Order***, Exhibit C, largely re-confirming the October Order; and
- The ***Termination Order***, Exhibit A, rescinding the Title 42 program in general and the August Order in particular.

The details and effect of each of these are set forth in the State's Complaint, which the State incorporates by reference.

This case also involves four other orders issued by the Defendants related to COVID-19. Those are:

- The ***Air Traveler Testing Order***, Exhibit D, which requires everyone flying to the United States to show either a negative COVID-19 test or proof of having recently recovered from COVID-19;
- The ***Land Traveler Vaccination Order***, Exhibit E, which refuses entry to the United States to all visitors arriving by land who cannot prove, on demand, having been vaccinated against COVID-19;
- The ***Air Traveler Vaccination Order***, Exhibit F, which requires that all visitors arriving in the United States by air either to prove, on demand, having been vaccinated against COVID-19 or to quarantine or isolate for two weeks; and
- The ***Masking Order***, Exhibit G, which requires all persons in a transportation hub, public transit, or conveyance traveling between transportation hubs to wear a mask.

## Standard and Summary of the Argument

The APA specifically empowers the Court to "issue all necessary and appropriate process to postpone the effective date of an agency action . . . pending conclusion of the review proceedings." 5 U.S.C. § 705. Whether to stay the effective date of the Termination Order—that is, whether to preliminarily enjoin the Defendants from implementing that order—depends on the familiar four-factor test for equitable relief. *See Texas v. United States*, 95 F. Supp. 3d 965, 973 (N.D. Tex. 2015).

Texas is entitled to that injunction because it satisfies each factor of the familiar four-factor test. *See, e.g.*, *Daniels Health Scis., LLC v. Vascular Health Scis., LLC*, 710 F.3d 579, 582 (5th Cir. 2013). First, it is likely to prevail on the merits; the Defendants violated the APA both by failing to follow the proper procedures and by promulgating an arbitrary and capricious rule. *See* 5 U.S.C. § 706(2)(A), (D). Second, there is a substantial threat—actually, an ongoing suffering—of irreparable injury; Texas cannot recover money damages for the financial losses it will suffer, and if the Defendants believe their own explanations, the Termination Order will immediately boost Texans' exposure to the COVID-19 virus and likely lead to an unknown number of COVID-19 infections. Finally, the balance of harms and the public interest favor the injunction Texas seeks; the public is always served by holding the government to its legal obligations, and, again, if the Defendants believe their own explanations, the Termination Order violates their duty to protect the health of American residents and citizens.

# Argument

## A. Texas is likely to prevail on the merits.

"Likely to prevail on the merits" is a term of art that merely requires that Texas make a prima facie case on each element of its claim. *See Daniels Health*, 710 F.3d at 582 (citing *Janvey v. Alguire*, 647 F.3d 585, 595–96 (5th Cir. 2011)). Texas easily clears that bar; the Defendants' decision was both unreasoned and promulgated without the required notice-and-comment procedures.

### 1. The Defendants' decision to terminate Title 42 was unreasoned.

The Termination Order violates the APA because it is arbitrary, capricious, and an abuse of discretion. *See* 5 U.S.C. § 706(2)(A). Before promulgating the Termination Order, the Defendants had to engage in "reasoned decisionmaking," meaning that their process had to be "logical and rational," with their decision being lawful "only if it rests on a consideration of the relevant factors" that "includ[es] a rational connection between the facts found and the choice made." *Sierra Club v. EPA*, 939 F.3d 649, 664 (5th Cir. 2019) (cleaned up). Under this standard, unexplained inconsistencies in the rulemaking records are grounds for striking down the action. *Id.*

The Termination Order fails both standards. The Defendants did not consider all relevant factors before terminating Title 42, and the Termination Order is inconsistent with the Defendants' other COVID-19 orders.

### a. The Termination Order is inconsistent with and not rationally connected to the Defendants' other COVID-19 orders.

The Termination Order is doomed because comparing it to the Defendants' other COVID-19 orders reveals unexplainable and irrational inconsistencies. *See Sierra Club*, 939 F.3d at 664. While no one expects the Defendants' policies will be seamlessly compatible, the differences between the Termination Order

and the Defendants' other orders shows fundamental, irreconcilable, and fatal discontinuities in how they treat similar COVID-19 issues.

### i. The Air Traveler Testing Order.

The most notorious of these conflicts is flagged in the Termination Order itself—the unexplained differences between the Termination Order and the still-active Air Traveler Testing Order, also promulgated by Walensky. That order, as the Termination Order explains, requires that "[a]ll air passengers two years or older with a flight departing to the United States from a foreign country must show either "a negative COVID-19 viral test result" no more than a day old or "documentation of having recovered from COVID-19 in the past 90 days…." Exh. A, 87 Fed. Reg. at 19,941, 19,947 (Apr. 6, 2022) (citing Exh. D, 86 Fed. Reg. 69,256 (Dec. 7, 2021). The Testing Order states that such proof of immunity "is necessary to reduce the risk of transmission of the [COVID-19] virus" and that it will remain in effect until it "is no longer necessary to prevent the further introduction, transmission, and spread of COVID-19 into the United States." Exh. D at 69,260. Visitors who do not comply with those requirements are not allowed to enter the United States, and an aircraft that has not confirmed that its passengers comply may not enter the United States or allow passengers to disembark there. *Id.* at 69,261.

This reasoning and that of the Termination Order cannot be squared. According to the Termination Order, "the public health findings underlying the August [2021] Order have changed." Exh. A at 19,953. The most recent iteration of the Testing Order, however, was issued in December 2021—five months after that. CDC stated then that a negative COVID-19 test or recovery from COVID-19 was "necessary to reduce the risk of transmission of the [COVID-19] virus," Exh. D at 69,260, and it states now, in the Termination

Order, that it still "believes that the[se] restrictions . . . continue to be necessary and are appropriately balanced to minimize restrictions on individuals." Exh. A at 19,952.

This directly contradicts the rest of the Termination Order. If "high rates of vaccine and infection-induced immunity in the [United States];" "the availability of effective therapeutics, testing, and well-fitting masks;" and "97.1% of the U.S. population['s] living in an area classified as having a 'low' COVID-19 Community Levels [sic]" justify the Termination Order because those "readily available and less burdensome public health mitigation tools" make Title 42 unnecessary, then they justify cancelling the Testing Order as unnecessary, too. The immunity rates; availability of masks, testing, and treatment; and number of people in low-community transmission areas remains the same whether a person arrives legally on an airliner or illegally at the Southwest Border. Moreover, while the Testing Order restrictions may "reduce the risk of transmission of the [COVID-19] virus," those who violate it are subject to being immediately returned to their point of origin—the very thing that Title 42 currently does with covered aliens to eliminate the possibility that they will bring COVID-19 into the country.

### ii. The Vaccination Orders.

The two vaccination orders, both post-dating the August Order that Walensky now claims is out of date, similarly demonstrate the lack of reasoning behind the Termination Order.

In the Air Travel Vaccination Order issued in November 2021, Walensky mandated that all visitors to the United States traveling by air furnish on demand proof of vaccination against COVID-19. Those who are unable to do so

are required to quarantine or isolate themselves for two weeks. Exh. F, 86 Fed. Reg. 61,224 (Nov. 5, 2021).

The Land Traveler Vaccination Order, issued in January 2022, goes even further. There, Mayorkas ordered that, "due to the risk of continued transmission and spread of . . . COVID-19 between the United States and Mexico," only aliens "who are 'fully vaccinated against COVID-19' and can provide 'proof of being fully vaccinated against COVID-19' upon request" would be allowed to enter the United States from land ports of entry along the U.S.–Mexico border—that is, anyone arriving at a land port of entry without proof of vaccination is turned away. Exh. E, 87 Fed. Reg. at 3428. As support for this decision, Mayorkas cited CDC's recommendations, *id.* at 3426, and noted that CBP had assessed "that a testing option is not operationally feasible given the significant number of land border crossers that go back on forth on a daily, or near-daily basis, for work or school" and that CBP faced "additional operational challenges associated with verifying test results, given the wide variation in documentation." *Id.* at 3426 fn. 10.

The Termination Order discusses neither of these orders, much less reconciles their disparate policies. Indeed, it could not. As with the Air Traveler Testing Order, they cannot be squared with the Termination Order. If "high rates of vaccine and infection-induced immunity in the [United States];" "the availability of effective therapeutics, testing, and well-fitting masks;" and "97.1% of the U.S. population['s] living in an area classified as having a 'low' COVID-19 Community Levels [sic]" justify the Termination Order because those "readily available and less burdensome public health mitigation tools" make Title 42 unnecessary, then they justify cancelling the Vaccination Orders, too. The immunity rates; availability of masks, testing, and treatment; and number of people in low-community-level areas remains the same whether

a person arrives at the border legally or illegally. Those arriving legally at a port of entry without proof of vaccination are either denied entry or required to quarantine themselves for two weeks. Terminating Title 42 eliminates for illegal aliens the possibility of the former, and there is no replacement policy requiring the latter. There is simply no basis for holding authorized immigrants and visitors to a higher standard than aliens who enter the United States illegally.

### iii. The Masking Order.

The only COVID-19 order the Termination Order bothers to address is the Masking Order, Exh. G, 86 Fed. Reg. 8025, 8026 (Feb. 1, 2021).[1] It attempts to distinguish that order on several grounds, *see* Exh. A at 19,946 fn. 57, all of which fail.

The first difference, according to the Termination Order, is that "conveyances and transportation hubs . . . are locations where large numbers of people may gather and physical distancing can be difficult." But the same is true of facilities where illegal immigrants are detained; the potential of spreading COVID-19 in crowded detention and processing facilities was one of the motivators of the October Order. The Termination Order cites nothing that says these crowded conditions will change—and indeed concedes that they will likely be worse.

---

[1]   The Masking Order was recently enjoined as beyond CDC's statutory authority, inadequately explained, and issued without good cause to dispose of notice-and-comment requirements. *See Health Freedom Defense Fund, Inc. v. Biden*, No. 8:21-cv-1693, 2022 WL 1134138 (M.D. Fla. Apr. 18, 2022). Though the federal government has appealed that decision, CDC has announced it will no longer enforce the order.

Second, "many people need to take public transportation for their livelihoods." But the same could be said to be true of aliens who attempt to enter the United States either to find work or to claim asylum.

Third, "[p]assengers (including young children) may be unvaccinated and some on board, including personnel operating the conveyances or working at the transportation hub, may have underlying health conditions that cause them to be at increased risk of severe illness." Yet the same is true of illegal aliens themselves; those traveling with illegal aliens; and those working at facilities where illegal aliens are detained, transported, or processed. Indeed, one of the concerns animating the October Order was the exposure of Defendants' personnel to COVID-19 carried by illegal aliens.

Fourth, unvaccinated persons "may not have the option to disembark or relocate to another area of the conveyance." The same is true of illegal aliens themselves, particularly those who are smuggled by human traffickers; those who are traveling with illegal aliens; and those working at facilities where illegal aliens are detained, transported, or processed.

Fifth, "[t]ransportation hubs are also places where people depart to different geographic locations, both across the United States and around the world. Therefore, an exposure in a transportation hub can have consequences to many destination communities if people become infected after they travel." The same is true of facilities where illegal aliens are detained, transported, or processed—particularly given the federal government's practice of transporting illegal aliens throughout the country for further processing after they are paroled.

## b. The Termination Order did not consider all relevant factors.

Nor did the Defendants consider all the relevant factors before issuing the Termination Order. "Agency action is lawful only if it rests on a consideration of the relevant factors." *Michigan v. EPA*, 579 U.S. 743, 750 (2015) (citing *Motor Vehicle Mfrs. Assn. of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). As described above, the Defendants did not consider how the Termination Order is fundamentally incompatible with the representations they made in other COVID-19 related orders. But there is yet more.

For example, Texas will face increased healthcare costs due to the increased presence of illegal aliens with COVID-19 who otherwise would have been excluded from the country under Title 42, and it has relied on the Title 42 program in planning for the COVID-19 related costs it should expect to incur. The Termination Order hand-waves these interests as unreasonable, essentially because CDC was always going to determine someday that COVID-19 was not sufficiently threatening to continue Title 42. Exh. A at 19,954. That is a strawman. While a reasonable State would not expect a perpetual emergency, it would expect that the costs imposed on its healthcare system would be considered in determining whether an emergency continues to exist— costs that the Termination Order addresses nowhere.

Similarly, the Defendants themselves imported irrelevant factors into their decision, and to the extent that those factors were relevant, they were required to consider the countervailing evidence—which they did not. As the Termination Order acknowledges, the Title 42 regulation and orders "are not, and do not purport to be, policy decisions about controlling immigration; rather," they "depend[] on the existence of a public health need." Exh. A at 19,954. The Termination Order nevertheless justifies its evasion of notice-and-comment procedures in part based on the "restrictions on application for

asylum and other immigration processes under Title 8" that Title 42 causes, on Title 42's "significant disruption of ordinary immigration processing," and on the time "DHS requires . . . [to] begin regular immigration processing pursuant to Title 8." Exh. A at 19,956. But if Texas's "relying on an order under [Title 42] as a means of controlling immigration . . . would not be reasonable or legitimate," then neither can be DHS's similar reliance. And if the Defendants' concerns about the immigration process are connected enough to Title 42 to warrant dodging notice and comment, then Texas's countervailing concerns about the immigration process—including the costs that illegal immigration imposes on it both as a sovereign and as *parens patriae*—are sufficiently connected to Title 42 to demand consideration.

### c. The Termination Order itself demonstrates that the factors it did consider received only partial consideration.

It is easy for an agency to say that it considered a factor, but the agency must actually do it. "Agency action is lawful only if it rests on a consideration of the relevant factors." *Michigan v. EPA*, 579 U.S. at 750 (2015) (citing *Motor Vehicle Mfrs. Assn*, 463 U.S.at 43. "Stating that a factor was considered . . . is not a substitute for considering it." *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986). The "'searching and careful' inquiry" the Court must make "to determine if [the Defendants] actually *did* consider" the relevant facts reveals that Walensky's discussion of the factors she identifies as changed are mere lip service. *Id.* (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971) (emphasis in *Getty*).

**Testing.** According to Walensky, "widely available [testing] in the United States . . . may decrease the necessity for testing residents in congregate settings." Exh. A at 19,949. Yet Walensky did not discuss whether the Defendants are capable of testing every illegal alien they encounter for

processing. That number totaled more than 221,000 in March 2022—roughly 70,000 more than CBP had estimated would occur, and roughly 40,000 more than CBP predicts would occur in a "medium encounter" scenario once the Title 42 program ends. Indeed, CBP itself predicts roughly 360,000 to 540,000 encounters per month in a high or very-high scenario. *See* DHS Sw. Border Coordination Ctr., *Sw. Border Strategic Concept of Operations*, at 2–3 (Mar. 28, 2022).

*Vaccinations.* Walensky notes an increase in the number of persons around the world who are "fully vaccinated with a primary vaccine series." Exh. A at 19,950. This is flawed on at least three levels. Once, she discusses global numbers rather than numbers in Mexico and the Northern Triangle of Guatemala, El Salvador, and Honduras, from which most illegal aliens come. Two, she discusses the wrong cohort—residents of a country rather than illegal aliens from that country encountered by the Defendants. Third, she notes "full[] vaccination with a primary vaccine series," but she does not note what proportion of the vaccinated received the generally ineffective Sinopharm or Sinovac vaccines—one or both of which are approved for use in most countries in the Western Hemisphere.[2]

*Treatment.* Walensky points to wider availability of treatments for COVID-19. But medical treatment is not free, and Walensky does not note that the cost of those treatments for illegal aliens in Texas will be borne by charity-care providers and the State itself through its federally mandated Emergency Medicaid program. Exh. A at 19,950.

---

[2]  Nicole E. Basta & Erica E.M. Moodie, eds., *COVID-19 Vaccine Devt. & Approvals Tracker*, available at covid19.trackvaccines.org (last visited Apr. 22, 2022).

***DHS procedures.*** Walensky cites "DHS mitigation measures," such as DHS facilities' "incorporat[ing] some of the recommended COVID-19 mitigation measures for congregate settings" and DHS's goal "to provide vaccinations to up to 6,000 migrants a day . . . across the Southwest Border by May 23, 2022." Exh. A at 19,950–51. Yet Walensky does not note which mitigation measures DHS has adopted or the effectiveness of those measures. Nor does she note whether DHS can meet its announced goal of roughly 180,000 vaccinations per month, much less whether it could vaccinate the 540,000 illegal aliens CBP predicts it may encounter each month.

Even when she must acknowledge the obvious, Walensky does not grapple with it. Walensky recognizes that the Termination Order itself "will lead to an increase in the number of noncitizens being processed in DHS facilities[,] which could result in overcrowding in congregate settings." Exh. A at 19,956. Moreover, she acknowledges that DHS's projection of even further increases in encounters, leading to even further crowding in DHS facilities. *Id.* She dodges these concerns by noting that "DHS reports that it is taking steps to plan for such increases" and that delaying the termination until May 23 will "provide DHS with time to scale its vaccination program, as well as ready its operational capacity [and] implement appropriate COVID-19 protocols." Exh. A at 19,955–56. But the Termination Order does not discuss what DHS's plans are, how it will achieve them, and whether its goals are even achievable—particularly as DHS is preparing to implement significant other changes to processing aliens at the southwest border.

And there is good reason to believe that DHS's stated goals are illusory. DHS itself has represented that "increasing detention capacity is costly and time-consuming" and would likely require "several months inspecting potential facilities, hiring additional staff, procuring additional supplies, and

negotiating contracts with relevant third parties." *See* Defs.' Post-Trial Mem. of Law, *Texas v. United States*, No. 6:21-cv-00016, ECF No. 223 at 32 (Mar. 18, 2022). And "[f]urther, absent an additional appropriation from Congress, DHS would have to finance this expansion in detention capacity by transferring funds from other DHS components, like the Coast Guard or Secret Service, or reprogramming funds within ICE, thus harming other DHS missions that are crucial to national security." *Id.* The Termination Order does not state why a mass remodeling-testing-and-vaccination regime would be any more achievable—particularly on the short timeline between the Termination Order and its effective date.

### 2. The Termination Order was promulgated without the necessary notice-and-comment period.

The Termination Order is additionally void because it was adopted without the required notice-and-comment proceedings, a failure for which the Defendants have no excuse. *See* 5 U.S.C. § 553(b)–(c). This "fundamental flaw . . . normally requires vacatur of the rule." *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 85 (D.C. Cir. 2020).

The press of time was not a concern. *Cf.* 5 U.S.C. § 553(b)(B). The good-cause exception to the APA's notice-and-comment requirement is intended for situations when there is true danger in not acting, not when the agency simply finds them inconvenient. *See U.S. Steel Corp. v. EPA*, 595 F.2d 207, 214 (5th Cir. 1979) (vacating air-quality determinations); *Tex. Food Indus. Assn. v. U.S. Dept. of Ag.*, 842 F. Supp. 254, 256–57 (W.D. Tex. 1993) (vacating labeling rules for un- and partially cooked meat). That danger was not present here; there was ample time for notice and comment. Indeed, while the initial Title 42 regulation was announced as an interim final rule, CDC opened a 30-day notice-and-comment period to enable the public to point out flaws in, potential

improvements to, and even reasons for rescinding the rule before it became final, doing so at a time when the COVID-19 pandemic had only recently been declared an emergency and the harm it would inflict was still only conjectural. It cannot be the case that the situation in March 2020, when little was known of COVID-19 and the scope and impact of the public-health emergency were only conjectural, was more suited to notice and comment than is the situation in April 2022, when CDC is attempting to lift the Title 42 orders due to the lack of a public-health emergency.

Nor does the Termination Order's purported relation to foreign affairs except it from the notice-and-comment rules. *Cf.* 5 U.S.C. § 553 (a)(1). The Termination Order does not "involve the mechanisms through which the United States conducts relations with foreign states," nor was it the product of an "agreement between the United States and another country." *Capital Area Immigrants' Rights Coalition v. Trump*, 471 F. Supp. 3d 25, 55 (D.D.C. 2020). Downstream effects on foreign relations are not enough; to qualify for the exception, the Termination Order would have to directly target a foreign-affairs function of the federal government. *See id.* It does not.

## B. Texas is suffering irreparable harm.

Texas has suffered and continues to suffer irreparable harm because of the Defendants' actions. The October Order acknowledged as much:

> [S]everal cities and states, including several located at or near U.S. borders, continue to experience widespread, sustained community transmission that has strained their healthcare and public health systems. Furthermore, continuing to slow the rate of COVID-19 transmission is critical as states and localities ease public health restrictions on businesses and public activities in an effort to mitigate the economic and other costs of the COVID-19 pandemic.

Exh. B at 65,812.

In particular, Texas's required expenditures under the Emergency Medicaid program will continue to increase as the Defendants release more aliens from their custody, particularly those who have not been screened for COVID-19. The August Order recognizes that this is a concrete harm, not a potential or hypothetical harm that might occur at some point in the future. The "flow of migration directly impacts not only border communities and regions, but also destination communities and healthcare resources of both." Exh. C at 42,835.

The Fifth Circuit has already recognized how the federal government's actions resulting in increased illegal immigration cause Texas irreparable harm, specifically including Emergency Medicare spending. *Texas v. Biden*, 20 F.4th 928, 969–73 (2021). Texas has already described the millions of dollars it spends on healthcare for those illegally in the country, including the pools from which it is drawn and why COVID-positive aliens admitted into the state will be a drain on those pools. *See* Exh. H. That financial harm is irreparable— once Texas has spent money to care for an alien with COVID-19, it is gone. The federal government is under no obligation to repay Texas for what it spends, and it is immune from being forced to do so. *Texas v. United States*, 328 F. Supp. 3d 662, 737 (S.D. Tex. 2018) (irreparable injury where no possibility of recompense from federal government). The quintessential reparable harm— an ability to recover money damages—is absent.

## C. The public interest and the equities favor an injunction.

Because this is a case with a State on one side and the federal government on the other, the public-interest and balance-of-equities factors collapse into a single consideration. *See, e.g.*, *Nken v. Holder*, 556 U.S. 418, 435 (2009). The

balancing act here requires little delicacy "There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). The harms to Texas and its citizens are set forth in the Defendants' orders themselves: increased imposition on the resources of local governments, charities, and the State's fisc—and if the Defendants' still-active Air Traveler Testing Order, Vaccination Orders, and Masking Order are to be believed, an increased chance of the spread of one of the most virulent diseases of modern times. The imposition on the Defendants should the injunction be granted, on the other hand, is that they will be forced to live up to what they said before they decided to change their mind without justification.

## Prayer for Relief

Texas respectfully requests that the Court postpone or preliminarily enjoin the Defendants' implementation of the Termination Order.

Given the short time before the Termination Order takes effect, Texas further respectfully requests that the Court expedite its consideration of this Motion so that the decision whether to postpone or enjoin is made before May 23.

Dated April 22, 2022.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711-2548
(512) 936-1700

/s/ Aaron F. Reitz
AARON F. REITZ
*Lead Counsel*
Deputy Attorney General for Legal Strategy
Texas Bar No. 24105704
aaron.reitz@oag.texas.gov

LEIF A. OLSON
Special Counsel
Texas Bar No. 24032801
leif.olson@oag.texas.gov

CHRISTOPHER D. HILTON
Chief, General Litigation Division
Texas Bar No. 24087727
christopher.hilton@oag.texas.gov

GENE P. HAMILTON*
America First Legal Foundation
300 Independence Avenue SE
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

CHRISTOPHER J. HAJEC*
MATT A. CRAPO*
Immigration Reform Law Institute
25 Massachusetts Ave., NW, Suite 335
Washington, DC 20001
(540) 205-7986
litigation@irli.org

*Counsel for the State of Texas*

---

\* Motion for admission *pro hac vice* forthcoming.

## Certificate of Word Count

I certify that, according to the word-count feature of Microsoft Word, the body of this motion contains 4,787 words.

/s/ Aaron F. Reitz

## Certificate of Conference

I certify that counsel for the State of Texas has conferred with counsel for Defendants and that Defendants are opposed to the relief requested herein.

/s/ Aaron F. Reitz